Dear Mr. Christian:
This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following questions:
 1. Does 10A O.S.Supp. 2010, § 2-2-806[10A-2-2-806] limit the request for proposals for the construction of a replacement juvenile facility to a "secure facility," like the L.E. Rader Center, or should the term "suitable facility" be interpreted as something broader, which may include a secure facility, but which may also include other facilities suitable to house juveniles "within [Office of Juvenile Affairs'] custody"?
 2. With the addition of Section 2-2-806 in Title 10A, did the Legislature intend to exempt the request for proposals from the Central Purchasing Act should the Board of Juvenile Affairs choose to promulgate rules governing the acquisition process?
 3. What is the effect of Section 2-2-806 on the agency's existing powers and authorities? May the Office of Juvenile Affairs execute its duties and powers under Section 2-7-202 to acquire and/or construct "any and all facilities," or lease "real property," or "establish and maintain facilities," in lieu of or in addition to the authorities and directives provided in Section 2-2-806?
 I. Background
The Office of Juvenile Affairs ("OJA") operates under the statutory authority of the Oklahoma Juvenile Code, 10A O.S. 2001 Supp. 2010, §§ 2-1-101-2-9-114. OJA was
created on July 1, 1995, as a result of legislation enacting the Oklahoma Juvenile Code. See
1995 Okla. Sess. Laws ch. 352, § 70.OJA provides programs and services to juveniles involved in the juvenile justice system. By *Page 2 
statute, OJA is the state's "planning and coordinating agency for statewide juvenile justice and delinquency prevention services."Id. § 2-7-301(A)(1) (emphasis added). The duties and functions of the Board of the OJA and of the Executive Director are provided in 10A O.S.Supp. 2010, §§ 2-7-101[10A-2-7-101] and 2-7-201, respectively.
Your questions concern an enactment from the 2010 Legislative Session, [1] S.B. 1486, codified within the Juvenile Code at 10A O.S.Supp. 2010, § 2-2-806[10A-2-2-806], and related to its authorization for the acquisition and management of a new facility to house juveniles.
 A. The Office of Juvenile Affairs shall initiate a separate request for proposals for the construction of a suitable facility to house juveniles within its custody to replace a facility with capacity in excess of one hundred twenty-five (125) available secure beds. The Board of Juvenile Affairs is authorized to enter into a lease-purchase agreement for the construction or acquisition of such facility, pursuant to the provisions of law.
 B. The Office of Juvenile Affairs shall initiate a separate request for proposals for the razing of property needed to construct the facility specified in subsection A of this section. The Board is authorized to enter into a contract for the razing of property, pursuant to the provisions of law.
 C. The Office of Juvenile Affairs shall initiate a separate request for proposals for the management and operation of the facility specified in subsection A of this section. The Board is authorized to enter into a contract for the management and operation of such facility, pursuant to the provisions of law.
 D. It is the intent of the Legislature that the lease-purchase agreement specified in subsection A of this section provide that, upon conclusion of the lease-purchase term, the title will transfer to the Office of Juvenile Affairs.
 E. The Board is authorized to promulgate rules and establish procedures necessary to implement the provisions of this act.
 F. The Department of Central Services shall work in conjunction with the Office of Juvenile Affairs to implement the provisions of this act.
Id. *Page 3 
 II. Does 10A O.S.Supp. 2010, § 2-2-806[10A-2-2-806]. Limit the Request for Proposals for the Construction of a Replacement Juvenile Facility to a "Secure Facility," Like the L.E. Rader Center, or Should the Term "Suitable Facility" be Interpreted as Something Broader, Which May Include a Secure Facility, but Which May Also Include Other Facilities Suitable to House Juveniles "Within [OJA's] Custody"?
You first ask, in effect, whether the Legislature's use of the phrase "suitable facility to house juveniles within its custody" must be construed to require that the contemplated facility be a "secure facility" as is the facility that is slated to be closed and replaced. "The primary goal of rules of statutory construction is to ascertain the legislature's intent. Such intent must be gleaned from the statute in view of its general purpose and object."DeLaughter v. State ex rel. Dep't of Mental Health SubstanceAbuse Serv., 47 P.3d 462, 465 (Okla. 2001) (citations omitted).
The general purpose and objective of Section 2-2-806 may be discerned from its face. It directs that OJA issue a request for proposals for the construction or acquisition of a new facility to house juveniles in its custody. Id. § 2-2-806(A). It contemplates that the intended facility will replace a facility with "capacity in excess of one hundred twenty-five (125) available secure beds." Id. The Lloyd Rader Children's Center ("Rader") is the facility to be replaced although it was not named in the legislation.[2] The OJA staff confirmed that Rader is the only facility within its purview with that large a number of secure beds, and that the plan has been to close the facility for some time. Therefore, the legislative intent, as expressed in subsection A, is that the new facility replaces Rader.
Within the Oklahoma Juvenile Code ("Code"), "Facility" is a defined term.
 16. "Facility" means a place, an institution, a building or part thereof, a set of buildings, or an area whether or not enclosing a building or set of buildings which is used for the lawful custody and treatment of juveniles. A facility shall not be considered a correctional facility subject to the provisions of Title 57 of the Oklahoma Statutes[.] *Page 4 
 Id. § 2-1-103. Other types of facilities are defined within the Code, including "Behavioral health facility," "Group home," "Institution," "Juvenile detention facility," "Rehabilitative facility," and "Training school" or "secure facility." Seeid. "Suitable facility" as used in subsection A, is not a defined term within the Code. "Words and phrases of a statute are to be understood and used not in an abstract sense, but with due regard for context and they must harmonize with other sections of the act to determine the purpose and intent of the legislature."McNeill v. City of Tulsa, 953 P.2d 329, 332 (Okla. 1998). Because it is not a defined term, in order to answer your question we must look to the use of the phrase "suitable facility" within the context of the section. Under the maxim "noscitur a sociis," "the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it." Sullins v. Am. Med.Response, 23 P.3d 259, 263 (Okla. 2001).
Webster's Third New International Dictionary defines "suitable" to mean: "2 a : adapted to a use or purpose . . .b : appropriate from the viewpoint of propriety, convenience, or fitness . . . c : having the necessary qualifications : meeting requirements [.]" Id. at 2286. "[T]he words of a statute should generally be assumed to be used by the law-making body as having the same meaning as that attributed in ordinary and usual parlance." Neer v. State ex rel. Okla. Tax Comm'n,982 P.2d 1071, 1078 (Okla. 1999). As written we can assume that "suitable" is intended to require that the facility; 1) be suitable to house juveniles within OJA custody, and 2) that the facility is suitable to replace Rader. Since Rader is a secure facility, does it naturally follow that the Legislature intended that the new facility must necessarily be a secure facility? We think not. As mentioned, "secure facility" is a defined term within the Code. When the Legislature defines terms that appear in legislative enactments, those definitions are binding in the interpretation of those sections of the statute in which those terms appear. See Oliver v. City of Tulsa,654 P.2d 607, 611 (Okla. 1982).
The Legislature's decision to omit the term "secured" is indicative of its intent. Had the Legislature intended to require the Rader facility be replaced with a secure facility, it would have used the term "secure facility" rather than "suitable facility." Instead, it left the interpretation of "suitable facility to house juveniles within its custody to replace a facility with capacity in excess of one hundred twenty-five (125) available secure beds" (10A O.S.Supp. 2010, § 2-2-806[10A-2-2-806](A)) to the discretion of OJA, enabling it to exercise its statutory function as the state's "planningand coordinating agency for statewide juvenile justice and delinquency prevention services."Id. § 2-7-301(A)(1) (emphasis added).
With that being said, we note that the discretion granted to OJA to implement this statute is not unfettered. We view the phrase, "with a capacity in excess of one hundred twenty-five (125) available secure beds," as a limitation on that discretion. Id. § 2-2-806(A). Certainly reasonable minds could differ with regard to the purpose for the Legislature's use of this phrase. Subsection A is ambiguous. "The test for ambiguity in a statute is whether the statutory language is susceptible to more than one reasonable interpretation." YDF, Inc. v. Schlumar,Inc., 136 P.3d 656, 658 (Okla. 2006). The phrase may reasonably be read within its context as serving merely to identify Rader as the facility to be replaced. However, we think the more well-reasoned and consistent interpretation is that the phrase is also a statement of the legislative intent that, whether the facility is "secure" or "something broader," in order to be "suitable" to replace Rader, it must, at a minimum have a *Page 5 
"capacity in excess of one hundred twenty-five (125) availablesecure beds." 10A O.S.Supp. 2010, § 2-2-806[10A-2-2-806](A) (emphasis added). "Expressions of doubtful meaning will be construed so as to promote harmony in the various provisions of a statute and give practical effect to the intention of the legislature if possible." Sullins,23 P.3d at 264. The Legislature could have left the minimum number of secure beds to the discretion of OJA by omitting any reference to the number of secure beds, but it did not. Therefore, a facility suitable to replace Rader must have a minimum of 125 secure beds.
 III. With the Addition of Section 2-2-806 in Title 10A, Did the Legislature Intend to Exempt the Request for Proposals From the Central Purchasing Act Should the Board of Juvenile Affairs Choose to Promulgate Rules Governing the Acquisition Process?
You next ask whether the authority granted to OJA by Section 2-2-806 reflects an intention on the part of the Legislature to exempt OJA from the general statutory obligation as an agency of state government to comply with the Central Purchasing Act, (74 O.S. 2001 Supp. 2010, §§ 85.1 — 85.44D) as administered by the Department of Central Services for purposes of this section. The Oklahoma Central Purchasing Act expressly provides that "[a]ll activities of any state agency . . . relating to purchasing shall be under the direction of the Purchasing Division unless otherwise provided by the Oklahoma Central Purchasing Act."Id. § 85.3(D). The pertinent provisions of Sections 85.4 and 85.5 also provide:
 A. Except as otherwise provided by the Oklahoma Central Purchasing Act, every state agency shall make all acquisitions used, consumed or spent by the state agency in the performance of its official functions by the presentation of requisitions to the Purchasing Division.
Id. § 85.4.
 A. Except as otherwise provided in this section, pursuant to the provisions of Section 85.4 of this title, the State Purchasing Director, under the supervision of the Director of the Department of Central Services, shall have sole and exclusive authority and responsibility for all acquisitions used or consumed by state agencies.
Id. § 85.5.
In view of these statutory provisions, the key inquiry to determine whether OJA is subject to the requirements of the Central Purchasing Act is whether it is a "state agency" for purposes of that Act. *Page 6 
Such is not in question. OJA is clearly a "state agency" pursuant to Section 85.2 of the Central Purchasing Act, and thus, unless otherwise provided for, is subject to the requirements of that act.
In 74 O.S.Supp. 1987, § 85.12[74-85.12],[3]
the Legislature specifically excluded certain state agencies from the scope of the Central Purchasing Act, including the Oklahoma Municipal Power Authority and the Grand River Dam Authority. OJA is not among the agencies exempted from the Central Purchasing Act by name.See 74 O.S.Supp. 2010, § 85.12[74-85.12]. Further, the Legislature excluded certain acquisitions for numerous agencies that are otherwise subject to the Central Purchasing Act. We note that certain of OJA's acquisition categories are excluded (contracts with designated Youth Service Agencies and acquisitions for clothing for juveniles). See id., § 85.12(25), (34). The Legislature did not include the services contemplated by Section 2-2-806 among these exclusions. See id., § 85.12. This demonstrates the Legislature clearly intended OJA to remain subject to the Central Purchasing Act in its implementation of the Section 2-2-806. See City ofDuncan v. Bingham, 394 P.2d 456, 460 (Okla. 1964) (stating, "legislative silence, when it has authority to speak, may be considered as giving rise to an implication of legislative intent");State ex rel. Caldwell v. Oldfield,98 P. 925 (syllabus) (Okla. 1908) ("presumption is that the Legislature does not intend to make any change in the existing law, except as expressly declared").
Although you have inquired only about the Central Purchasing Act, we note that 10A O.S.Supp. 2010, § 2-2-806[10A-2-2-806](A), authorized a public construction contract and thus, also implicates the Public Competitive Bidding Act of 1974 (61 O.S. 2001 Supp. 2010, §§ 101 — 138). Therefore, whether the Legislature intended, with the addition of Section 2-2-806, to exempt OJA from the Competitive Bidding Act in the event that OJA chooses to promulgate rules to implement Section 2-2-806, is an equally valid question. A public construction contract is defined as "any contract, exceeding Fifty Thousand Dollars ($50,000.00) in amount, awarded by any public agency for the purpose of making any public improvements or constructing any public building or making repairs to or performing maintenance on the same." 61 O.S.Supp. 2010, § 102[61-102](6). The Competitive Bidding Act, which is administered by the Construction and Properties Division of the Department of Central Services in pertinent part states:
 A. Unless otherwise provided by law, all public construction contracts exceeding Fifty Thousand Dollars ($50,000.00) shall be let and awarded to the lowest responsible bidder, by open competitive bidding after solicitation for sealed bids, in accordance with the provisions of the Public Competitive Bidding Act of 1974.
61 O.S. 2001, § 103[61-103] (emphasis added). "Public agency" means "the State of Oklahoma, and any county, city, town, school district or other political subdivision of the state."Id. § 102(5). It is clear *Page 7 
that OJA is for this and all purposes, a public agency, andunless otherwise provided by law, is subject to the Competitive Bidding Act for any public construction projects.[4]
In each of the subsections A, B and C of Section 2-2-806, the Legislature has expressed a definitive directive to OJA to initiate a request for proposals, [5] and in each instance it authorized the Board of Juvenile Affairs to enter into an agreement (a lease purchase agreement is specified in subsection A) following the request for proposal ("RFP") bidding process. In subsection E it authorized, but did not require, that OJA "promulgate rules and establish procedures necessary to implement the provisions of this act." Id. Your question requires that we discern what the Legislature intended with the addition of subsection E. Stated differently, by authorizing OJA to promulgate rules and establish procedures to implement the contemplated bidding processes and contract executions, did the Legislature authorize OJA to develop and formulate acquisition processes that are separate and outside the scope and purview of the Central Purchasing Act and the Competitive Bidding Act, and thereby exempt it from the respective requirements of each?
We note that the Board, by virtue of its enabling statute, is authorized to adopt and promulgate rules to implement the duties and responsibilities of the Office pursuant to the Code. 10A O.S.Supp. 2010, § 2-7-101[10A-2-7-101] (I)(1). Presumably, OJA would have had authorization to promulgate rules in response to Section 2-2-806 if necessary, even if subsection E had not been added. Given the rule of statutory construction that says that every word or sentence is presumed meaningful, you ask, how then should this subsection be interpreted? See Hill v. Bd. of Educ.,944 P. 2d 930, 933 (Okla. 1997) ("This court will not assume that the Legislature has done a vain and useless act. Rather it must interpret legislation so as to give effect to every word and sentence.").
In addressing the impact of Section 2-2-806 our task is to determine the intention of the Legislature. We must then attempt to reconcile the apparent duplication in these legislative enactments, both of *Page 8 
which authorize OJA to promulgate rules. Further, the various portions of the enactments on a particular subject should be construed together and be given effect as a whole. "Whenever it is possible to construe two [statutes] by giving effect to both without doing violence to either, such construction is preferred over one that may be productive of conflict between them." Grand River DamAuth. v. State, 645 P.2d 1011, 1019 (Okla. 1982).
Subsection E pertains not to the whole of the Code but to this specific statute, Section 2-2-806, which was enacted for a specific purpose and project. We find no inconsistency. We view this rulemaking authorization as consistent with and as extending the Board's general rulemaking authority, to the extent necessary and as determined by the Board, for the facility to replace Rader.
There is nothing within the text of Section 2-2-806 to indicate that this extension of rulemaking authority (if OJA decides to promulgate rules and establish procedures) should be interpreted as exempting the anticipated lease purchase agreement and contacts for services from either the bidding requirements of the Central Purchasing Act, or with regard to the public construction project from the Competitive Bidding Act. Further, subsection F of Section 2-2-806 states, "The Department of Central Services shall work in conjunction with the Office of Juvenile Affairs to implement the provisions of this act." This indicates that the Legislature envisioned continued involvement of the Department of Central Services.
The OJA is empowered to adopt rules and regulations to effectuate its purposes. See 10A O.S.Supp. 2010, §§ 2-7-101[10A-2-7-101](H)(1), (I)(1); 2-2-806(E). Generally, an agency has such express and implied "powers as are necessary for the due and efficient exercise of the powers expressly granted" by statute, or which "may be fairly implied from the statute." Marley v. Cannon,618 P.2d 401, 405 (Okla. 1980). However, state agencies have only those powers that are granted to them by statute, and an agency may not, by rule, expand its powers beyond those granted by statute.Okla. Alcoholic Beverage Control Bd. v. Moss,509 P.2d 666, 668 (Okla. 1973). By virtue of promulgating a rule, the OJA may not grant unto itself the power to be exempted from the requirements of the Department of Central Services, whether the acquisitions implicate the Central Purchasing Act or the Competitive Bidding Act.
 IV. What Is the Effect of Section 2-2-806 on the Agency's Existing Powers and Authorities? May the Office of Juvenile Affairs Execute its Duties and Powers Under Section 2-7-202 to Acquire and/or Construct "Any and All Facilities" or Lease "Real Property," or "Establish and Maintain Facilities," in Lieu of, or in Addition to the Authorities and Directives Provided in Section 2-2-806?
Title 10A O.S.Supp. 2010, § 2-7-202[10A-2-7-202] confers some rather broad powers on the OJA Executive Director, which include the power and duty to: *Page 9 
 10. Establish and maintain such facilities and institutions as are necessary or convenient for the operation of programs for children under the jurisdiction of the Office of Juvenile Affairs;
 11. Lease, from time to time, any real property which the Board of Juvenile Affairs shall determine advisable to more fully carry into effect the operation of the Office of Juvenile Affairs in accordance with applicable state statutes. All such leases for real property shall be subject to the provisions of Section 63 of Title 74 of the Oklahoma Statutes;
 . . . .
 14. Acquire, construct, extend, and operate any and all facilities of all kinds which in the judgment of the Executive Director and the approval of the Legislature shall be necessary or convenient to carry out the duties of the Office of Juvenile Affairs, as authorized by law; and
 15. Exercise all incidental powers which are necessary and proper to implement and administer the purposes of the Oklahoma Juvenile Code.
Id.
By asking what effect Section 2-2-806 has on OJA's existing powers and authorities, you are asking whether the Legislature with the enactment of Section 2-2-806, limited or added to the authority bestowed on OJA and its Executive Director "[to] acquire, construct, extend, and operate any and all facilities of all kinds . . . necessary or convenient to carry out the duties of the Office of Juvenile Affairs." Id. § 2-7-202(14).
In answering your question we are guided by well-established precedent. The goal of any "statutory construction is to ascertain and give effect to legislative intent." Inre J.L.M. v. State, 109 P.3rd 336, 338 (Okla. 2005). If possible two statutes should be read in harmony to avoid conflict. SeeIndep. Sch. Dist. No. 89 v. Okla. City Fed'n of Teachers,612 P.2d 719, 722 (Okla. 1980). A coherent and harmonious construction is possible when one considers that Section 2-2-806 is a special statute with applicability limited to the facility intended to replace Rader.
We find no indication the Legislature intended to tie the hands of OJA until such time as the objectives of Section 2-2-806 have been fully met. In construing statutes, it is presumed the Legislature was aware of other existing statutes on the same subject matter, and such statutes are "to be viewed as in pari materia and must be construed as a harmonious whole." Pellegrino v. State ex rel.Cameron Univ., 63 P.3d 535, 540 (Okla. 2003).
If the Legislature had intended to prevent OJA from exercising any of its authority for establishing and providing facilities until any or all facets of Section 2-2-806 had been complied with, it would *Page 10 
have so stated. As we have observed, it directed that certain RFPs be issued, and it authorized certain contracts be let. It authorized the promulgation of rules and procedures, and it directed the DCS to work in conjunction with OJA to implement the statute. It placed no time limit nor order of priority upon the projects OJA is authorized to pursue in fulfillment of its duties and responsibility as the planning and coordinating agency for statewide juvenile justice and delinquency prevention services. See
10A O.S.Supp. 2010, § 2-7-301[10A-2-7-301](A)(1). Neither do we read into Section 2-2-806, an intention on the part of the Legislature to usurp or second guess the expertise and primary function of OJA to determine what might best serve the population of juveniles that it is charged to care for and house. A basic principle of statutory interpretation is, nothing that is not within the manifest intention of the Legislature as gathered from the statute itself may be read into the statute. "[A] statute should not be construed any more broadly . . . than its terms require." See American-FirstTitle Trust v. First Fed. Sav. Loan Ass'n,415 P.2d 930, 939 (Okla. 1965) (citation omitted).
However, as previously discussed, the facility intended to be replaced is known, and the specific mandate is clear. With regard to the construction request for proposal as discussed in subsection A, OJA is authorized to issue the request for proposal, and then to enter into a lease-purchase agreement for the construction or acquisition. The statute contemplates the construction for ownership by OJA or a lease-purchase agreement that will terminate with ownership vested in OJA, as provided in subsection D of Section 2-2-806. There is no room in Section 2-2-806 for any other title-related arrangement, such as a straight lease or a lease with an option to purchase. Title 10A O.S.Supp. 2010, § 2-7-202[10A-2-7-202](D)(11) confers on OJA the authority to lease real property consistently with Section 63 of Title 74 of the Oklahoma Statutes (concerning the role of DCS in management of state property). "[W]here there are two statutory provisions, one of which is special and clearly includes the matter in controversy, and prescribes different rules and procedures from those in the general statute, the special statute and not the general statute applies."Sw. Bell Tel. v. Okla. County Excise Bd.,618 P.2d 915, 919 (Okla. 1980). To the extent that Section 2-2-806 is inconsistent with or operates to limit the authority vested in OJA by Section 2-7-202, and as it pertains to the replacement facility for Rader, Section 2-2-806, therefore, controls as a clear statement of legislative intent. "Where the former statute was clear or its meaning had been judicially settled, the amendment may reasonably indicate legislative intent to alter the law." Irwin v. Irwin, 433 P.2d 931, 934 (Okla. 1965). OJA may not ignore the mandates of Section 2-2-806, simply because it could have but for this enactment, and with the approval of the Legislature replaced Rader under the authority already vested in it by Section 2-7-202. Subsection 2-2-806(D) mandates that OJA construct or lease purchase, and retain title to, the facility that will replace Rader.
Section 2-2-806 need not be interpreted to have implication beyond the subject facility.
 In the construction of statutes it is axiomatic that the statute as amended is to be construed as a consistent whole, in harmony with common sense and reason and that every part should be given effect; that amendments are to be construed together with the original act to which they relate as constituting one law and also together with other statutes on the same subject as part of a coherent system of legislation. *Page 11 
Prettyman v. Halliburton Co., 841 P.2d 573, 580 (Okla. 1992). Whether and to what extent OJA has or will have complied with the requirements of Section 2-2-806 is a question of fact, and beyond the scope of an Attorney General's Opinion. 74 O.S.Supp. 2010, § 18b[74-18b](A)(5)
It is, therefore, the official Opinion of the Attorney Generalthat:
 1. Title 10A O.S.Supp. 2010, § 2-2-806[10A-2-2-806] does not limit the request for proposals for the construction of a replacement juvenile facility to a "secure facility," like the L.E. Rader Center. The term "suitable facility" as used in Section 2-2-806, contemplates something broader, which may include a secure facility, but which may also include other facilities suitable to house juveniles "within [Office of Juvenile Affairs'] custody," provided that a facility suitable to replace the Rader facility must have in excess of 125 secure beds. Id.; see Sullins v. Am. Med. Response, 23 P.3d 259, 264 (Okla. 2001).
 2. The Legislature did not intend, with the addition of Section 2-2-806 in Title 10A, to exempt the request for proposals from the Central Purchasing Act or from the Competitive Bidding Act, in the event that the Board of Juvenile Affairs chooses to promulgate rules governing the acquisition process. See Okla. Alcoholic Beverage Control Bd. v. Moss, 509 P.2d 666, 668 (Okla. 1973).
 3. The Office of Juvenile Affairs may execute its duties and powers under Section 2-7-202 to acquire and/or construct "any and all facilities," or lease "real property," or "establish and maintain facilities," in addition to the authorities and directives provided in Section 2-2-806. However, with regard to the replacement for the Rader facility, the Office of Juvenile Affairs is required by Section 2-2-806 to issue the cited request for proposals and to contract for the construction or lease purchase of the real property. Further, by virtue of subsection 2-2-806(D), the Office of Juvenile Affairs must acquire title to the facility. See also, Irwin v. Irwin, 433 P.2d 931, 934 (Okla. 1965), Prettyman v. Halliburton Co., 841 P.2d 573, 580 (Okla. 1992).
[1] See 2010 Okla. Sess. Laws ch. 465, § 1.
[2] The official name and designation of the center for children situated at Sand Springs, Oklahoma, shall be Lloyd E. Rader Children's Center. The supervision, management, operation and control of the Center and all property, records, equipment and supplies related thereto shall be the responsibility of the Office of Juvenile Affairs.
[3] See 1987 Okla. Sess. Laws ch. 205, § 29(11), (12); 1987 Okla. Sess. Laws ch. 236, § 51(B)(11), (12).
[4] We must not read the use of the term "Request for Proposal" in the context of Section 2-2-806 as inconsistent with the Competitive Bidding Act, but rather in a general sense, and as a reference to or initiation of the bid process. Such reading is required in order to achieve a consistent and harmonious interpretation. "It is the duty of this Court to reconcile the different provisions of statutes, as far as practicable, to make them not only consistent and harmonious, but also to give an intelligent effect to each." Sharp v. TulsaCounty Election Bd., 890 P.2d 836, 840 (Okla. 1994).
[5]
 Typically, an IFB [ITB] is rigid and identifies the solution to the problem. By definition, the invitation specifically defines the scope of the work required by soliciting bids responsive to detailed plans and specifications set forth. On the contrary, an RFP is flexible, identifies the problem, and requests a solution. Consideration of a response to an IFB is controlled by cost, that is, the lowest and best bid, whereas consideration of an offer to an RFP is controlled by technical excellence as well as cost.
Dana, Larson, Roubal Assoc. v. Bd. of Comm'rs,864 P.2d 632, 637 (Idaho Ct. App. 1993).
"When a prospective contractor responds to an RFP . . . he is not necessarily submitting a final bid but may be merely opening the door for discussions with the government."Id. at 637 n. 3 (quoting GLENN E. MONROE, Gov't Cont. Law Man. § 2.35 at 28 (1979)).